# In the United States Court of Federal Claims

No. 22-1269
(Filed Under Seal: November 12, 2025)
(Reissued: December 3, 2025)[1]

```
***************************************
ALAN CORREIRA,                          *
                                        *
              Petitioner,               *
                                        *
    v.                                  *
                                        *
SECRETARY OF HEALTH AND HUMAN           *
SERVICES,                               *
                                        *
              Respondent.               *
***************************************
```

*Ronald C. Homer*, with whom was *Meredith Daniels*, Conway, Homer, P.C., Boston, MA, counsel for Petitioner.

*James V. Lopez*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Respondent.

## OPINION AND ORDER

**DIETZ, Judge.**

Petitioner Alan Correira seeks review of Chief Special Master ("CSM") Brian Corcoran's decision denying him compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1 *et seq*. ("Act"). Mr. Correira alleges that he suffered from Guillain-Barré Syndrome ("GBS") because of an influenza ("flu") vaccine. The CSM concluded that, because the onset of Mr. Correira's GBS symptoms fell outside a medically acceptable timeframe, his illness was not caused in fact by the flu vaccine. Mr. Correira contends that the CSM's decision was arbitrary, capricious, or otherwise not in accordance with the law. The Court agrees. Therefore, the Court **GRANTS** the petition, **VACATES** the decision, and **REMANDS** the case for further action in accordance with this opinion.

---

[1] Pursuant to Vaccine Rule 18(b) of the Rules of the United States Court of Federal Claims, the Court issued this Opinion and Order under seal on November 12, 2025, and directed the parties to file a proposed public version of this Opinion and Order on or before November 26, 2025. *See* [ECF 37]. The parties did not file a proposed public version of the Opinion and Order, nor did they otherwise propose any redactions. Accordingly, the Court reissues this Opinion and Order without redactions.

I.   **BACKGROUND**[2]

On September 20, 2019, Mr. Correira received a flu vaccine. *Correira v. Sec'y of Health & Hum. Servs.*, No. 22-1269, 2025 WL 1892886, at *1 (Fed. Cl. June 3, 2025). On October 1, 2019, he underwent prostate surgery, during which he received nitrous oxide. *Id.* On November 23, 2019, sixty-four days after receiving the vaccine, Mr. Correira went to the Emergency Department ("ED"), complaining of "numbness and tingling in his bilateral upper extremities." *Id.* Mr. Correira claimed these symptoms began on November 18, 2019, five days earlier. *Id.* He was examined and "diagnosed with bilateral upper extremity neuropathy." *Id.* Thereafter, on November 26, 2019, Mr. Correira had a follow-up appointment with his primary care physician, Dr. Irwin. *Id.* During that visit, Mr. Correira complained of "numbness in his upper extremities, feet, tongue, and lips, but denied [any] weakness." *Id.* He "also stated that his symptoms had improved over the past three days, but were still present." *Id.* He was examined and "assessed with paresthesia of unclear etiology," but his gait was deemed normal, and he did not display any "motor or sensory deficits." *Id.* The next day, Mr. Correira visited a neurologist, Dr. Leber. *Id.* At that visit, Mr. Correira complained of "numbness in his forearms, tongue, and left foot," and "stated that on November 18, 2019, he woke with his hands and forearms feeling cold and somewhat number." *Id.* He also told Dr. Leber that he had undergone "prostate surgery on October 1, 2019, which Dr. Leber noted could cause myelopathy in patients with previous anemia." *Id.* Dr. Leber conducted a neurologic exam and noted "a slight Bell's palsy of the left eyelid and mild absent sensation in the right foot." *Id.* Additionally, Dr. Leber noted that given the sudden onset of numbness, "one has to think of cervical myelopathy or cervical issues." *Id.* "A subsequent MRI was unremarkable," and Mr. Correira's "B12 and folic acid were within normal limits." *Id.*

On December 6, 2019, Mr. Correira again saw Dr. Leber. *Correira*, 2025 WL 1892886, at *2. This time, although Mr. Correira complained of a "recent onset of stumbling, slurring speech and tingling in his face and scalp," Dr. Leber did not note any "objective abnormality on examination, other than residual from previous left Bell's palsy." *Id.* Additionally, Dr. Leber did not have an explanation for Mr. Correira's "subject sensory symptoms." *Id.* Dr. Leber "prescribed alprazolam for his anxiety." *Id.* Later that day, Mr. Correira returned to the ED, complaining of "increased left facial droop that started that morning." *Id.* There, he was diagnosed with Bell's palsy. *Id.*

On December 9, 2019, Mr. Correira returned to his primary care physician, who examined him, found nothing remarkable, and then referred him to a neurologist. *Correira*, 2025 WL 1892886, at *2. Three days later, Mr. Correira returned once more to the ED. *Id.* This time, he presented with "numbness throughout his body, upper extremity pain, dizziness, and difficulty walking that started just prior to his arrival." *Id.* The left side of his face was drooping, and he displayed "absent bilateral reflexes, and an abnormal gait." *Id.* Mr. Correira was given a lumbar puncture, which "showed elevated protein levels." *Id.* The admitting ED physician noted that Mr. Correira had received a flu vaccine in September and questioned whether he had "progressive [GBS] versus Lambert-Eaton syndrome." *Id.* (alteration in original). Additionally, notes taken the following day indicated that while Mr. Correira reported subjective symptoms, "no objective

---

[2] The factual background is derived from the CSM's decision. *See Correira v. Sec'y of Health & Hum. Servs.*, No. 22-1269, 2025 WL 1892886 (Fed. Cl. June 3, 2025).

abnormalities could be observed." *Id.* A neurologist, Dr. Khademi, opined that he "could not rule out the possibility [that Mr. Correira was suffering from] an autoimmune neuropathy" such as GBS. *Id.* He "also noted that the nadir of the weakness [was] usually 3-4 weeks from onset." *Id.* On December 14, 2019, the ED discharged Mr. Correira "with possible diagnoses including GBS and La[m]bert-Eaton syndrome, an autoimmune neurological condition." *Id.*

On December 16, 2019, Mr. Correira followed up with Dr. Irvin, who suspected that he had a "predominantly sensory form of GBS." *Correira*, 2025 WL 1892886, at *2 (internal quotation marks omitted). Four days later, Mr. Correira went to Dr. Khademi for a second opinion. *Id.* Dr. Khademi examined Mr. Correira and noted that he presented with "absent reflexes, left peripheral facial weakness, impaired gait, [and] reduced sensation, but [that he had] normal motor strength." *Id.* Dr. Khademi concluded that he had "inflammatory polyneuropathy and possible GBS." *Id.*

On December 21, 2019, Mr. Correira returned once more to the ED, complaining of "worsening paresthesia, and trouble breathing and swallowing." *Correira*, 2025 WL 1892886, at *2. He presented with "decreased sensation in his trunk and chest, decreased grip strength, left sided facial droop, and absent reflexes." *Id.* He was alternatively diagnosed with "GBS versus variant, a more chronic condition such as chronic demyelinating syndrome, and Eaton-Lambert syndrome." *Id.* While there, Mr. Correira saw another neurologist, Dr. Huntley, and told him that he had experienced five weeks of "progressive weakness." *Id.* Dr. Huntley noted that Mr. Correira demonstrated "'wildly' uncontrolled ambulation and absent reflexes," and assessed him "with paresthesia, dysphagia, [and] a history of Bell's palsy with gait disorder." *Id.* Dr. Huntley also indicated that he was unsure whether Mr. Correira required Intravenous Immunoglobulin ("IVIG"), which Dr. Khademi had ordered but which had not yet been set up, and concluded that "at the core [Mr. Correira] has [GBS]." *Id.* (second alteration in original). Mr. Correira received "a five-day course of IVIG and was discharged on December 26, 2019." *Id.* at *3. His symptoms improved markedly after his discharge and on May 20, 2020, although "he reported some residual numbness," he also reported "significant improvement to Dr. Vasquez, a neurologist." *Id.*

On September 9, 2022, Mr. Correira sought compensation under the Act. Pet. for Vaccine Compensation [ECF 1]. He amended his petition on March 6, 2023, alleging that he contracted GBS from the flu vaccine. Am. Pet. for Vaccine Compensation [ECF 18] at 1.[3] On August 1, 2023, because Mr. Correira's "alleged first symptoms appeared outside of the *longest time* accepted for a non-Table flu/GBS claim," the CSM ordered Mr. Correira to show cause why his claim should not be dismissed and to file any additional evidence. [ECF 24] at 1 (emphasis in original). Thereafter, Mr. Correira filed a medical expert report and additional medical literature, [ECF 25], and responded to the show cause order, [ECF 27]. On June 3, 2025, the CSM denied Mr. Correira's request for compensation and dismissed his claim. *Correira*, 2025 WL 1892886, at *7. Mr. Correira sought review of the CSM's decision on June 30, 2025. Pet'r's Mot. for Review [ECF 29]. The government responded on July 29, 2025, Resp. [ECF 33], and the Court held oral argument on October 30, 2025.

---

[3] All references to page numbers within documents filed electronically with the Court refer to the page numbers generated by the CM/ECF system.

## II.     STANDARD OF REVIEW

This Court has jurisdiction under the Act to review a special master's decision. 42 U.S.C. § 300aa-12(e)(2). In reviewing a special master's decision, this Court may:

> (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision, (B) set aside any of the findings of fact or conclusions of law of the special master found to be arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or (C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. §§ 300aa-12(e)(2)(A)-(C).

This Court reviews a special master's findings of fact under the "arbitrary and capricious" standard, legal questions under the "not in accordance with law" standard, and discretionary rulings under the "abuse of discretion" standard. *Turner v. Sec'y of Health & Hum. Servs.*, 268 F.3d 1334, 1337 (Fed. Cir. 2001). With respect to the arbitrary and capricious standard, "no uniform definition . . . has emerged," but it is "a highly deferential standard of review" such that "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1527-28 (Fed. Cir. 1991); *accord Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (a decision is arbitrary and capricious only if it is "so implausible that it could not be ascribed to a difference in view"). The "not in accordance with law" standard, on the other hand, is applied without deference to legal determinations such as "[w]hether the special master applied the appropriate standard of causation . . . ." *Deribeaux v. Sec'y of Health & Hum. Servs.*, 717 F.3d 1363, 1366 (Fed. Cir. 2013). Lastly, the abuse of discretion standard applies to the special master's evidentiary rulings, such as determinations regarding the qualification of experts and the admissibility of their testimony. *Piscopo v. Sec'y of Health & Hum. Servs.*, 66 Fed. Cl. 49, 53 (2005) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).[4]

The United States Court of Appeals for the Federal Circuit has made it clear that special masters, as the finders of fact, have the responsibility to weigh the persuasiveness and reliability of evidence presented to them, and if appropriate, the credibility of testimony. *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1325 (Fed. Cir. 2010); *see Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999) ("[T]he rules of evidence require that the trial judge determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." (internal quotation marks omitted) (second alteration in original)). Further, the special masters have broad discretion in determining the credibility of witnesses and weighing the evidence, and these credibility determinations are "virtually unreviewable" by the

---

[4] "The [abuse of discretion standard] will rarely come into play except where the special master excludes evidence." *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992); *accord Caves v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 119, 131 (2011), *aff'd*, 463 F. App'x 932 (Fed. Cir. 2012).

reviewing court. *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993). In other words, the reviewing court does not reweigh the evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses because these matters are within the purview of the factfinder. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1349 (Fed. Cir. 2010); *accord Loyd v. Sec'y of Health & Hum. Servs.*, No. 2022-1371, 2023 WL 1878572, at *2 (Fed. Cir. Feb. 10, 2023). As explained by the Federal Circuit, which applies the same standard of review, this Court is highly deferential to the special masters' factual determinations:

> We review de novo decisions of the Claims Court arising under the Vaccine Act, applying the same standard of review as the Claims Court applied to its review of the special master's decision. We owe no deference to the Claims Court or the special master on questions of law. We uphold the special master's findings of fact unless they are arbitrary or capricious. Thus, although we are reviewing as a matter of law the decision of the Claims Court under a non-deferential standard, we are in effect reviewing the decision of the special master under the deferential and capricious standard on factual issues. We do not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder. Rather, as long as a special master's finding of fact is based on evidence in the record that [is] not wholly implausible, we are compelled to uphold that finding as not being arbitrary or capricious. It is not our role to second guess the Special Master[']s fact-intensive conclusions particularly in cases in which the medical evidence of causation is in dispute.

*Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1248-49 (Fed. Cir. 2011) (internal citations and quotation marks omitted) (alterations in original); *accord White v. Sec'y of Health & Hum. Servs.*, 153 F.4th 1214, 1220 (Fed. Cir. 2025) (noting that while the Federal Circuit reviews United States Court of Federal Claims' decisions *de novo*, it applies the same legal standards).

### III.  LEGAL STANDARDS

The Act was established to compensate individuals for a vaccine-related injury or death after a showing that the vaccine caused that injury or death. 42 U.S.C. §§ 300aa-10(a)-13(a). The Act provides two ways for a petitioner to establish causation. *Munn*, 970 F.2d at 865. First, a petitioner may demonstrate causation through a statutorily prescribed presumption by showing that the alleged injury meets the criteria listed on the vaccine injury table ("Table"). 42 U.S.C. § 300aa-14. Thus, in a Table case, "if a petitioner can establish that [he] received a listed vaccine and experienced such symptoms or injuries within the specified timeframes, [he] has met [his] prima facie burden to prove that the vaccine caused [his] injuries." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1351 (Fed. Cir. 2008); *accord Grant v. Sec'y of Health & Hum.*

5

*Servs.*, 956 F.2d 1144, 1147 (Fed. Cir. 1992) ("The Table replaces traditional tort standards of causation in fact with a causation in law based on temporal association."). Alternatively, if a petitioner suffered an injury listed on the Table but not within the specified time period or if a petitioner suffered an "off-Table injury," he must prove "causation-in-fact" by a preponderance of the evidence.[5] *See* 42 U.S.C. §§ 300aa-11(c)(1)(C)(ii); *see also Broekelschen*, 618 F.3d at 1341-42. "[C]ausation-in-fact in the Vaccine Act context is the same as 'legal cause' in the general torts context." *de Bazan*, 539 F.3d at 1351 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999)). Thus, "the vaccine is a cause-in[-]fact when it is 'a substantial factor in bringing about the harm.'" *Id.* (quoting Restatement (Second) of Torts § 431(a)).

In *Althen v. Secretary of Health and Human Services*, the Federal Circuit articulated the following three-part test for demonstrating causation-in-fact:

> [A petitioner must] show by preponderant evidence that the vaccination brought about [the] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

418 F.3d 1274, 1278 (Fed. Cir. 2005). "The third *Althen* factor—a proximate temporal relationship between the vaccination and the injury—serves as a check on the first two factors." *Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121-22 (Fed. Cir. 2025). Further, "[w]hile this court's cases make clear that temporal association is not enough by itself to prove causation, the absence of temporal association can be enough to defeat a claim of causation." *Id.* (internal citations omitted). Before applying the *Althen* test, however, the Court must determine whether a petitioner has shown by preponderant evidence a "medically recognized" injury that is "more than just a symptom or manifestation of an unknown injury." *Lombardi v. Sec'y of Health & Hum. Servs.*, 656 F.3d 1343, 1352-53 (Fed. Cir. 2011) (explaining that "if the existence and nature of the injury itself is in dispute," then "identification of a petitioner's injury is a prerequisite to an *Althen* analysis of causation"). Next, "[w]hen applying *Althen*, the special master must consider the degree to which each factor is satisfied." *Cerrone*, 146 F.4th at 1122. "[A]fter weighing the degree to which the petitioner has proved each factor and considering any remaining evidence bearing on causation, the special master must determine whether the petitioner has proved that it is more likely than not that the vaccine caused his injury." *Id.*

"Once the petitioner has established a prima facie case for entitlement to compensation and thus met [his] burden to prove causation-in-fact, the burden shifts to the government to prove '[by] a preponderance of the evidence that the [petitioner's injury] is due to factors unrelated to the administration of the vaccine described in the petition.'" *de Bazan*, 539 F.3d at 1352 (quoting 42 U.S.C. § 300aa-13(a)(1)(B) (second and third alterations in original)). Under the Act, "factors unrelated to the administration of the vaccine" may include "infection, toxins, trauma (including

---

[5] "This court has interpreted the 'preponderance of the evidence' standard referred to in the Vaccine Act as one of proof by a simple preponderance, of 'more probable than not' causation." *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1279 (Fed. Cir. 2005).

birth trauma and related anoxia), or metabolic disturbances which have no known relation to the vaccine involved, but which in the particular case are shown to have been the agent or agents principally responsible for causing the petitioner's illness, disability, injury, condition, or death." 42 U.S.C. § 300aa-13(a)(2)(B). Significantly, while a petitioner need only demonstrate that the vaccine was a substantial factor in bringing about the alleged harm, the government must demonstrate that an unrelated factor "was the *sole* substantial factor in bringing about the injury." *de Bazan*, 539 F.3d at 1354 (emphasis added). In addition, the government's proof of alternative actual causation-in-fact must satisfy the same standard as the petitioner's proof of actual causation-in-fact in off-Table cases. *See Deribeaux*, 717 F.3d at 1368 ("The Secretary was 'required not only to prove the existence of [a factor unrelated], but also to prove by a preponderance of the evidence that the [factor unrelated] actually caused' the injury alleged.") (alterations in original) (quoting *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994)). However, if the Court finds that the government failed to prove alternative actual causation-in-fact, the petitioner is entitled to compensation. *de Bazan*, 539 F.3d at 1352. If the Court finds the parties' evidence to be in equipoise, the petitioner is still entitled to compensation. *Heinzelman v. Sec'y of Health & Hum. Servs.*, No. 07-01, 2008 WL 5479123, at *19 (Fed. Cl. Dec. 11, 2008) (citing *Knudsen*, 35 F.3d at 550).

## IV.  ANALYSIS

The CSM denied Mr. Correira's petition, concluding that "[t]he evidentiary record [did] not support [his] contention that his GBS began in a medically-acceptable timeframe after vaccination." *Correira*, 2025 WL 1892886, at *7. Mr. Correira argues that the CSM erroneously found—under the third *Althen* prong—that there was no proximate temporal relationship between the flu vaccine he received and his GBS symptoms. Pet'r's Mem. [ECF 30] at 11. Specifically, he asserts that the CSM arbitrarily conflated eight weeks with two months, *id.* at 12, that the CSM's interpretation of the pertinent medical study is flawed, *id.* at 15, and that the CSM erred by establishing an inflexible eight-week onset deadline, *id.* at 19.[6] For the reasons provided below, the Court concludes that the CSM's analysis under the third *Althen* prong was arbitrary, capricious, or otherwise not in accordance with the law. Thus, the Court remands the case to the CSM under 42 U.S.C. § 300aa-12(e)(2)(C) for further action in accordance with this opinion.

To begin, the Court is not persuaded that the CSM conflated eight weeks with two months. Mr. Correira argues that the CSM arbitrarily equated eight weeks (or fifty-six days) with two months (or approximately sixty days), [ECF 30] at 12, and that, because Mr. Correira's onset occurred fifty-nine days after he was vaccinated, the CSM's "failure to distinguish between these terms is not a mere technicality," *id.* at 14. While the CSM references the term "two months" on one occasion in his decision, *see Correira*, 2025 WL 1892886, at *6, and cites to other vaccine cases that appear to use the terms "two months" and "eight weeks" interchangeably, *id.* at *5-6, the CSM clearly applied an eight-week or fifty-six day timeframe in finding that Mr. Correira's GBS symptoms did not begin in a medically-acceptable timeframe, *id.* at *7. This is evident throughout the decision. *See id.* at *5 (stating that "onset of symptoms is demonstrated to have occurred *no longer than* six to eight weeks after vaccination" and that "[t]his means up to 56

---

[6] Mr. Correira does not challenge the CSM's finding that his GBS symptoms began "on or around November 18, 2019," fifty-nine days after he was vaccinated. *Id.* at 7.

7

days" (first alteration in original)); *id.* at \*6 (stating that "[t]hese facts accordingly are inconsistent with even the *longest timeframes* (eight weeks) accepted for a similar non-Table claims" (alteration in original)); *id.* \*6 n.7 (referring to "the proposed up-to-eight weeks timeframe"). Thus, there is no evidence that the CSM arbitrarily conflated eight weeks with two months.

However, the Court nevertheless finds that the CSM's decision is arbitrary. In the decision, the CSM stated that "[m]easuring from the September 20, 2019 vaccination, . . . a Table version of the claim in this case could only succeed if onset had occurred on or before November 1, 2019 – which clearly did not occur" and that "even a causation-in-fact claim would have *needed* to be based on symptoms beginning *no more than* two weeks after – or by November 15, 2019, *at the latest*." *Correira*, 2025 WL 1892886, at \*6 (emphasis added). In other words, the CSM stated that, for Mr. Correira's non-Table claim to succeed, the onset of his symptoms needed to occur, at latest, eight weeks or fifty-six days from vaccination. Yet, the CSM failed to articulate a rational basis for imposing such an eight-week deadline to deny Mr. Correira compensation. *See Exum v. Sec'y of Health and Hum. Servs.*, 175 Fed. Cl. 681, 700 ("[A] special master must clearly articulate its reasons for its conclusions.").

In his discussion of the applicable legal standard, the CSM made the following statement regarding the temporal requirements a petitioner must meet to establish causation-in-fact under *Althen*:

> There are nevertheless limits to the kinds of fact patterns that successfully establish that the flu vaccine "did cause" a particular petitioner's GBS under the second *Althen* prong. In most successful non-Table cases, onset of symptoms is demonstrated to have occurred no longer than six to eight weeks after vaccination. *See, e.g.*, *Barone*, 2014 WL 6834557, at \*13 (eight weeks is the longest reasonable timeframe for a flu/GBS injury). This means up to 56 days.

*Correira*, 2025 WL 1892886, at \*5. It appears that the CSM is referring to the following statement in *Barone*:

> Other special masters have never gone beyond a two-month (meaning eight week) interval in holding that a vaccination caused a demyelinating illness. *See, e.g.*, *Aguayo v. Sec'y of Health & Human Servs.*, No. 12-563V, 2013 WL 441013, at \*3 (Fed. Cl. Spec. Mstr. Jan. 15, 2013); *Corder v. Sec'y of Health & Human Servs.*, No. 08-228V, 2011 WL 2469736, at \*27-\*29 (Fed. Cl. Spec. Mstr. May 31, 2011) (proposed four month onset period from vaccination to GBS too long; two months is longest reasonable timeframe).

*Barone*, 2014 WL 6834557, at \*13. If the CSM was referring to the first sentence in the above paragraph, wherein he (the author of *Barone*) states that "[o]ther special masters have never gone beyond a two-month (meaning eight week) interval in holding that a vaccination caused a

demyelinating illness," *id.*, then the CSM failed to provide any support for his conclusion in *Corriera* because the statement alone is conclusory. Alternatively, if the CSM was referring to the cases he cited after the first sentence, the CSM similarly failed to provide support for his conclusion in *Corriera*. In both *Aguayo* and *Corder*, the special master concluded that three and one-half months and fourth months, respectively, was too long an interval between vaccination and GBS symptom onset to support an inference of causation.[7] The difference between Mr. Correira's fifty-nine-day interval and fifty-six days (eight weeks) is hardly comparable to the difference between the ninety-eight day interval (approximately three and one half months or fourteen weeks) in *Aguayo* or the 112 day interval (approximately four months or sixteen weeks) in *Corder* and fifty-six days. While these cases serve as examples of onset timeframes that fall far outside of the medically-acceptable window for inferring causation, they do not support the CSM's conclusion that, "[i]n most successful non-Table cases, onset of symptoms is demonstrated to have occurred *no longer* than six to eight weeks after vaccination." *Correira*, 2025 WL 1892886, at *5 (alteration in original). Nor do these cases support the CSM's conclusion that Mr. Correira's fifty-nine-day onset—three days outside of the eight-week mark—is not medically acceptable.

Next, in his analysis of a medical study offered by Mr. Correira's unrebutted expert,[8] the CSM stated:

> The medical literature offered in this case establishes that a reasonable timeframe for onset of GBS after vaccine administration would be no more than six to eight weeks, however. Schonberger at 105. Specifically, Schonberger indicates that most GBS cases after the flu vaccine that it evaluated occurred around 13-17 days, with their latest happening 41 days. *Id.* at 112. This is echoed by the timeframe set for the Table version of the claim (*see* 42 C.F.R. § 100.3 (2017)). (It is in fact arguably the case that *any* onsets that exceed the 3-42 day timeframe are suspect from a medical/scientific standpoint, since the onset timeframe is specifically engineered to be over-inclusive, rather than to reflect a precise framework in which a vaccine can, or cannot, cause injury).

*Correira*, 2025 WL 1892886, at *6 (emphasis in original) (citing Lawrence B. Schonberger *et al.*, *Guillain Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States*, 1976-1977, 110 Am. J. Epidemiology 105-23 (1979) ("the Study")).[9] According to the CSM, the Study's authors concluded on page 105 that "a reasonable timeframe

---

[7] In *Aguayo*, the special master noted that the petitioner did not provide an expert report to support his contention that his GBS was caused by the flu vaccine he received three and one-half months earlier. 2013 WL 441013, at *3. In *Corder*, the special master discussed all three *Althen* prongs. 2011 WL 2469736, at *27-29. Regarding the third prong, he stated that a four-month interval between vaccination and the onset of GBS symptoms was too long to be deemed caused by the flu vaccine. *Id.* at *29.

[8] The government neither offered its own expert nor submitted any evidence.

[9] The Study compared the incidence of GBS in adults in the United States who received the 1976-1977 swine influenza vaccine with the incidence of GBS in unvaccinated adults. Schonberger, 110 Am. J. Epidemiology at 105.

for onset of GBS after vaccine administration would be no more than six to eight weeks." *Id.* However, there is no explicit reference to such a timeframe on that page. Schonberger, 110 Am. J. Epidemiology at 105. Rather, in what appears to be a summary of the Study, the authors only make the following statement regarding the timing of GBS onset following vaccination: "The period of increased risk [of contracting GBS] was concentrated primarily within the 5-week period after vaccination, although it lasted for approximately 9 or 10 weeks." *Id.*

Additionally, the CSM stated that on page 112 of the Study, the authors "indicate[] that most GBS cases after the flu vaccine that [they] evaluated occurred around 13-17 days, with their latest happening 41 days." *Correira*, 2025 WL 1892886, at *6. Figure 5 on page 112 graphically depicts the number of reported GBS cases by two-day incremental periods as follows:



Schonberger, Study, 110 Am. J. Epidemiology at 112. However, the CSM's statement that the latest GBS case the authors evaluated occurred forty-one days after vaccination is incorrect. As noted above, in the introduction to the Study, the authors state that "[t]he period of increased risk [of contracting GBS following vaccination] . . . lasted for approximately 9 or 10 weeks." *Id.* at 105. Additionally, Figure 6, which graphically depicts the "[GBS] attack rates for population over 17 years of age, by week of onset after [flu] vaccination," shows .42 cases in week nine, and .40 cases in week ten. *Id.* at 113. Thus, while Figure 5 supports the CSM's conclusion that the highest concentration of GBS cases "occurred around 13-17 days" after vaccination, *Correira*, 2025 WL 1892886, at *6, it does not establish that the latest GBS case occurred on day forty-one or that the forty-one-day mark represents the outer limit of the risk period under the Study. Schonberger, 110 Am. J. Epidemiology at 112. Consequently, the CSM failed to explain how the Study "establishes that a reasonable timeframe for onset of GBS after vaccine administration would be *no more than six to eight weeks*." *Correira*, 2025 WL 1892886, at *6 (emphasis added).

After finding that "contemporaneous medical records preponderantly establish that the initial symptoms of Petitioner's GBS did not occur before November 18, 2019, 59 days after his vaccination," *Correira*, 2025 WL 1892886, at *6, the CSM concluded:

10

> These facts accordingly are inconsistent with even the *longest timeframes* (eight weeks) accepted for a similar non-Table claims recognized in reasoned Program decisions. *See, e.g.*, *Barone*, 2014 WL 6834557, at *13. Petitioner's onset thus occurred far too long after vaccination to be considered "medically acceptable to infer causation-in-fact." *See de Bazan*, 539 F.3d at 1352; *De La Cruz v. Sec'y of Health & Hum. Servs.*, No. 17-783V, 2018 WL 945834, at *1 (Fed. Cl. Jan. 23, 2018) (finding onset of GBS more than two months after flu vaccination to be not compensable under either a theory of causation in fact or significant aggravation).

*Id.* (emphasis in original) (footnote omitted). Once more, the CSM cited *Barone* for the proposition that, in similar non-Table claims, special masters have concluded that eight weeks is the outer limit when determining whether a flu vaccination was the cause in fact of an individual's GBS. *Id.* As discussed above, neither *Barone* nor the cases cited therein provide adequate legal support for this proposition. Further, while the special master in *De La Cruz* found that the onset of petitioner's GBS symptoms occurred "more than eight weeks after her flu vaccination," 2018 WL 945834, at *1, and that she did "not consider onset more than two months after flu vaccination to be compensable under either a theory of causation in fact or significant aggravation," *id.*, the only case she cited in support of his conclusion was *Corder*, *id.* Again, as noted above, the timeframe at issue in *Corder* was four months—roughly twice as long as the timeframe at issue in the instant case. *See Corder*, 2011 WL 2469736, at *29. Also, the Court notes that *De La Cruz* is barely a two-page decision with no substantive analysis, that the decision hinges, at least in part, on the petitioner's lack of a medical expert report, and that the petitioner concedes that she is unable to demonstrate entitlement to compensation. *De La Cruz*, 2018 WL 945834, at *1-*2. In contrast, Mr. Correira provided a medical expert report and claims entitlement to compensation.

Lastly, in a footnote at the end of the decision, the CSM stated:

> Admittedly, other special masters have accepted a comparably-lengthy timeframe. *See, e.g.*, *Cooper v. Sec'y of Health & Hum. Servs.*, No. 18-1885V, 2024 WL 1522331, at *20 (Fed. Cl. Mar. 12, 2024) (finding 60-day onset of GBS following a vaccination allows inference of causation); *Spayde v. Sec'y of Health & Hum. Servs.*, No. 16-1499V, 2021 WL 686682, at *19 (Fed. Cl. Jan. 27, 2021). But such decisions do not control this outcome. Moreover, they either involve a different vaccine (for *Cooper*, the pneumococcal vaccine), or were based on reasoning that justified stretching the eight-week timeframe a few days, in the interests of the Program's emphasis on generosity and a desire not to apply a hard, bright-line "rule." *Spayde*, 2021 WL 686682, at *19. Of course, the proposed up-to-eight weeks timeframe *itself* already exceeds the "rule" of the Table claim for the flu vaccine, and does not itself constitute something that can be deemed accepted as a general matter. Moreover, this thinking reflects a logic whereby any onset not

11

> shown to be facially impossible (say, more than 90 days) should be deemed medically acceptable. I do not consider that kind of reasoning consistent with the science applicable to how vaccines are thought to cause GBS, and it is not demanding scientific certainty to reject it.

*Correreira*, 2025 WL 1892886, at *6 n.7 (emphasis in original). While it is of course true that a petitioner seeking to establish that the flu vaccine caused GBS in a Table claim need only demonstrate that the symptoms occurred within three and forty-two days of vaccination, 42 C.F.R. § 100.3(a), the CSM failed to explain why the instant case is distinguishable from *Spayde*, which he described as being "based on reasoning that justified stretching the eight-week timeframe a few days, in the interests of the Program's emphasis on generosity and a desire not to apply a hard, bright-line 'rule,'" *Correreira*, 2025 WL 1892886, at *6 n.7. In other words, it is unclear why the CSM found that "the interests of the Program's emphasis on generosity and a desire not to apply a hard, bright-line 'rule'" did not apply in the instant case. *Id.*; *see Althen*, 418 F.3d at 1279-80 (stating that under the "Vaccine Act's preponderant evidence standard . . . close calls regarding causation are resolved in favor of injured claimants"). Although the cited decisions are not binding on the CSM, the fact that other special masters have found similar onset timeframes that extend beyond eight weeks or fifty-six days from vaccination to be suitable for inferring causation conflicts with the CSM's decision to impose an inflexible "up-to-eight weeks timeframe" in this case. Furthermore, the facts of this case do not require the CSM to consider whether an onset timeframe that has not been "shown to be facially impossible" should be "deemed medically-acceptable." *Correreira*, 2025 WL 1892886, at *6 n.7. Instead, Mr. Correreira's GBS symptoms began fifty-nine days after vaccination—just outside of the suggested eight-week timeframe. *See* [ECF 30] at 7. Because the CSM failed to articulate a rational basis for imposing an eight-week or fifty-six day symptom onset deadline in this case, the Court finds the decision to be arbitrary. *See Paluck v. Sec'y of Health and Hum. Servs.*, 786 F.3d 1373, 1384 (Fed. Cir. 2015) (finding that "the special master had no reasonable basis for setting a hard and fast deadline" where the relevant medical evidence "do[es] not purport to establish any definitive timeframe for the onset of clinical symptoms").

V.  **CONCLUSION**

Accordingly, Mr. Correreira's motion for review of the CSM's decision, [ECF 29], is **GRANTED**, and the CSM's decision of June 3, 2025, is **VACATED**. This case is **REMANDED** for further action in accordance with this Opinion and Order. Pursuant to 42 U.S.C. § 300aa-12(e)(2)(C), the CSM shall issue a remand decision within 90 days. The parties **SHALL CONFER** and **FILE** a notice with a proposed public version of this Opinion and Order on or before **November 26, 2025**.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz  
THOMPSON M. DIETZ, Judge